# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **PATRICIA A. BENTLEY,** ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 2:04cv00092 |
| ) | **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHART**, ) | |
| Commissioner of Social Security, ) | By: PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Patricia A. Bentley, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

-1-

than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bentley protectively filed her application for DIB on or about April 14, 2003, alleging disability as of January 1, 1997, based on lower back pain, bursitis in her shoulders, "nerve" problems and depression. (Record, ("R."), at 110-13, 121.) The claim was denied initially and upon reconsideration. (R. at 88-96, 97-105.) Bentley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 106.) The ALJ held a hearing on January 15, 2004, at which Bentley was represented by counsel. (R. at 177-96.)

The record contains two prior decisions dated June 18, 1998, and August 26, 1999. (R. at 31-41, 78-87.) These decisions indicate that Bentley alleged disability beginning January 1, 1993, based on "nerves," depression and lower back pain. (R. at 32, 78.) The ALJ found in both decisions that Bentley did not suffer from a severe impairment. (R. at 35, 82.)

By decision dated February 5, 2004, the ALJ denied Bentley's claim. (R. at 18-22.) The ALJ found that Bentley met the disability insured status requirements of the Act through September 30, 1998.[1] (R. at 22.) The ALJ found that Bentley had not engaged in substantial gainful activity since January 1, 1997. (R. at 22.) The ALJ

---

[1]Because Bentley was insured through September 30, 1998, she must prove that she was disabled at some point prior to October 1, 1998, in order to be eligible for DIB benefits.

also found that the medical evidence established that Bentley did not suffer from any severe impairment. (R. at 22.) Thus, the ALJ found that Bentley was not disabled under the Act and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(c) (2004).

After the ALJ issued his decision, Bentley pursued her administrative appeals, (R. at 13, 164), but the Appeals Council denied her request for review. (R. at 6-10.) Bentley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2004). The case is before this court on Bentley's motion for summary judgment filed March 31, 2005, and on the Commissioner's motion for summary judgment filed April 22, 2005.

*II. Facts*

Bentley was born in 1944, (R. at 110, 179), which classifies her as a person of "advanced age" under 20 C.F.R. § 404.1563(e). Bentley has an eighth-grade education and past work experience as an owner and operator of a used car lot, a secretary and a bookkeeper. (R. at 127, 179-83.)

Bentley testified that she could no longer work due to nerve problems. (R. at 182.) She stated that her customers would come in and find her asleep on the desk. (R. at 183.) Bentley testified that she had undergone surgery on her right shoulder because of a ruptured cyst approximately two year previously. (R. at 185.) She testified that she could not use her right hand. (R. at 185.) Bentley stated that she also had problems with bursitis in her right shoulder and arm and that she suffered from lower back pain. (R. at 185.) Bentley testified that she thought she could return to

gainful employment if she could sleep part of the day. (R. at 186.) She stated that she had a hard time "getting elevated" in the morning. (R. at 186.) Bentley stated that she slept until 10 a.m. or 11 a.m. in the morning, and then had to sit for awhile because she shook all over. (R. at 186.) She testified that she had marital problems around 1997 and was on medication during this time period. (R. at 187.) Bentley testified that she experienced difficulty sleeping because of hot flashes and problems with her arm. (R. at 186, 188.)

Cathy Sanders, a vocational expert, also was present and testified at Bentley's hearing. (R. at 189-95.) Sanders was asked to assume an individual of Bentley's age, education and work experience, who had the residual functional capacity to perform medium[2] work and who had no limitations as indicated in the Psychiatric Review Technique form, ("PRTF"), completed by Howard S. Leizer, Ph.D., a state agency psychologist. (R. at 66-74, 189-90.) Sanders testified that there were jobs available in significant numbers in the national economy that such an individual could perform, including jobs as a cleaner, a waiter, a cashier, a hand packager and clerical jobs. (R. at 190-91.) Sanders was asked to consider the same individual, but who was limited as indicated by the December 5, 2002, mental assessment completed by Dr. Arthur Amador, M.D. (R. at 133-35, 193.) She stated that there would be no jobs available that such an individual could perform. (R. at 193.)

In rendering his decision, the ALJ reviewed records from St. Mary's Hospital; Halifax Medical Center; Family Drug, Incorporated; Dr. Michael Moore, M.D.; Dr.

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with lifting or carrying of items weighing up to 25 pounds frequently. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2004).

-4-

Pierce Nelson, M.D., F.A.P.A.; Dr. Robert McGuffin, M.D.; Dr. Arthur Amador, M.D.; Howard S. Leizer, Ph.D., a state agency psychologist,; and R.J. Milan Jr., Ph.D., a state agency psychologist. Bentley's counsel submitted additional medical reports to the Appeals Council.[3]

The record shows that on June 30, 1995, Bentley was seen in the Halifax Medical Center Emergency Room. (R. at 149-57.) Bentley complained of sharp chest pain. (R. at 149-50, 152, 155.) Dr. Gary L. Morrison, M.D., noted that the chest pain appeared to be related to an incident in which Bentley found her husband in an adulterous relationship with a much younger woman. (R. at 150.) Bentley was advised to take anti-inflammatory medicine such as ibuprofen. (R. at 155.)

The record shows that Bentley saw Dr. Michael Moore, M.D., from December 31, 1996, to February 8, 1999. (R. at 46-58.) On December 31, 1996, Bentley complained of mental problems and nerve problems caused by a "change of life." (R. at 58.) She was diagnosed with situational stress, marital discourse, depression and situational anxiety. (R. at 58.) Dr. Moore prescribed Prozac and Serax and strongly recommended counseling. (R. at 58.) On February 7, 1997, and June 12, 1997, Bentley's depression and anxiety were reassessed. (R. at 57.) Bentley's anxiety and depression were reported to be well-controlled. (R. at 57.) Bentley reported that Prozac "made her feel like a new person." (R. at 57.) On November 13, 1997, Bentley complained of mild anxiety and sinus congestion. (R. at 51, 54.) Bentley reported that her depression was still under control with medication. (R. at 51, 54.) On July 2, 1998, Bentley complained that Prozac was making her drowsy. (R. at 55.) Bentley

---

[3]The additional medical reports filed with the Appeals Council did not pertain to Patricia A. Bentley. (R. at 165-76.)

stated that she could not work. (R. at 55.) She also reported that she stayed upset and continued to experience crying spells. (R. at 55.) On July 21, 1998, Dr. Moore discontinued Bentley's use of Prozac. (R. at 51, 55.) She was prescribed Effexor and was advised to continue taking Serax. (R. at 51.) On November 18, 1998, Bentley complained of being very anxious and nervous. (R. at 51.) Dr. Moore noted that her depression had minimally improved, and that she was having problems with her medication. (R. at 50-51.) Bentley also complained of crying spells, back pain, knee pain, stiffness and soreness. (R. at 50.) Bentley was diagnosed with severe anxiety, depression and osteoarthritis. (R. at 50.) Dr. Moore continued to prescribe the same medications. (R. at 50.) He opined that her nervous condition and depression would prevent her seeking gainful employment. (R. at 50.)

On March 9, 1998, Dr. Pierce Nelson, M.D., a neuropsychiatrist, saw Bentley at the request of Bentley's attorney. (R. at 60-61.) Bentley complained of stiffness in her hands, nervousness, "mental fatigue" and difficulty sleeping due to agitation, nightmares and crying. (R. at 60-61.) Bentley reported that she smoked up to two packs of cigarettes per day and drank four cups of coffee and "a lot of pop" per day. (R. at 61.) Bentley was diagnosed with major depression; however, Dr. Nelson considered Bentley competent to manage financial matters in her own behalf. (R. at 61.) By letter dated July 17, 1998, Dr. Nelson reported that the results of the Minnesota Multiphasic Personality Inventory, ("MMPI"), test were invalid. (R. at 59.) He further indicated that Bentley failed to return for further psychological examinations. (R. at 59.)

On September 18, 1998, Dr. Jack K. Cox, II, M.D., performed a disability examination of Bentley at St. Mary's Hospital. (R. at 62-64.) On physical exam

Bentley was able to do straight leg raises from a sitting position to the fullest extension of the knees bilaterally. (R. at 62.)  Bentley was able to do heel and toe walking and exhibited a five out of five handgrip bilaterally. (R. at 62.)  Bentley exhibited a full range of motion of her upper extremities, a full range of motion of the wrists for flexion and extension, as well as a full range of motion of her hands and fingers. (R. at 62.)  Her cerebellar exam was reported as normal. (R. at 62.)  Bentley was able to sit, stand and walk on command.  (R. at 62.)  She could lift, carry and handle objects without impairment. (R. at 62.)  Bentley's capacity for understanding was reported as intact. (R. at 62.)  Her immediate memory recall was graded as three out of three, and she was able to show sustained concentration within the examination. (R. at 62.)  The mental status exam revealed Bentley was alert and oriented.  (R. at 62.)  Bentley did not exhibit any sensory deficits, nor was there any motor function deficit. (R. at 63.)  Her motor strength was graded as five out of five. (R. at 63.) X-rays of the lumbar spine showed degenerative disc disease. (R. at 64.)

On September 28, 1998, Bentley was examined by Dr. Robert O. McGuffin, M.D., a state agency physician.  (R. at 65.) Bentley complained of "nerve" problems, bone spurs, bronchitis and lower back problems. (R. at 65.)  Dr. McGuffin noted degenerative disc disease in the upper lumbar spine according to x-rays taken in September 1998. (R. at 65.) Bentley's gait and station were normal. (R. at 65.)  There was no clubbing, cyanosis or edema in her extremities. (R. at 65.)  Bentley was able to heel and toe walk, and her grip strength was graded as five out of five. (R. at 65.) There was no evidence of a disabling lung condition. (R. at 65.)  Dr. McGuffin concluded that Bentley had no impairment-related physical limitations. (R. at 65.) These findings were affirmed by Dr. Donald R. Williams, M.D., another state agency physician. (R. at 65.)

On September 29, 1998, R.J. Milan Jr., Ph.D., a state agency psychologist, completed a PRTF, indicating that Bentley suffered from a nonsevere affective disorder. (R. at 66-74.) No evidence of any organic mental disorders was found. (R. at 68.) There was no evidence of schizophrenia, paranoia or other psychotic disorders. (R. at 68.) No evidence of mental retardation or autism, anxiety-related disorders, somatoform disorders or personality disorders was found. (R. at 70-71.) Bentley was also reported to have no substance addiction disorders. (R. at 72.) Milan concluded that Bentley was only slightly restricted in her activities of daily living, experienced only slight difficulties in maintaining social functioning, seldom experienced deficiencies of concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 73.) These findings were affirmed by Howard S. Leizer, Ph.D., another state agency psychologist. (R. at 66-67.)

On November 19, 1999, Dr. Moore completed a mental assessment indicating that Bentley had a seriously limited, but not precluded, ability to follow work rules, to interact with supervisors, to function independently, to maintain personal appearance and to demonstrate reliability. (R. at 158-60.) In all other areas of functioning, Dr. Moore concluded that Bentley had a poor or no ability to function. (R. at 158-59.) Dr. Moore also noted that Bentley should avoid all public interaction and stress, that she needed long-term psychiatric help and that she was totally and permanently disabled from any employment. (R. at 160.)

Bentley again saw Dr. Moore from July 20, 2000, to December 29, 2003. (R. at 137-46.) On July 20, 2000, December 19, 2000, and April 26, 2001, Bentley complained of anxiety, stress and depression. (R. at 144-46.) Dr. Moore continued

to prescribe Serax for an anxiety disorder and Effexor for depression. (R. at 144-46.) On August 23, 2001, Bentley complained of feeling nervous, having a knot behind her right shoulder and hot flashes. (R. at 143.) She continued with Serax and Effexor along with Protonex for gastroesophageal reflux disease. (R. at 143.) On January 15, 2002, Bentley complained of tightness in her chest and shortness of breath. (R. at 142.) She continued taking the same medications. (R. at 142.) On June 26, 2002, Bentley complained of fatigue and pain in her left elbow and right shoulder. (R. at 141.) She continued with Serax, Effexor and Protonex. (R. at 141.) On November 15, 2002, Bentley's medication was switched from Protonex to Erythromycin Ethyl Succinate. (R. at 140.) On March 17, 2003, Bentley complained of sleeping all the time and pain in her right shoulder. (R. at 139.) Dr. Moore continued to prescribe Serax and Effexor along with Naproxen for right rotator cuff tendinitis. (R. at 139.) On September 17, 2003, Bentley was diagnosed with bursitis in her right shoulder. (R. at 138.) On December 29, 2003, Bentley continued to complain of right shoulder pain and swelling. (R. at 137.) Dr. Moore diagnosed Bentley as having a ruptured epidermal inclusion cyst[4] and prescribed Augmentin. (R. at 137.)

On November 19, 2002, Dr. Arthur Amador, M.D., evaluated Bentley at the request of Bentley's attorney. (R. at 131-32.) Bentley reported depression symptoms. (R. at 131.) Bentley was reported to be adequately groomed. (R. at 132.) Dr. Amador noted intact memory and no signs of anxiety. (R. at 132.) Bentley denied suicidal or homicidal ideation. (R. at 132.) Dr. Amador diagnosed Bentley with

---

[4]The medical report listed an "EIC" which the court assumes means that Bentley was diagnosed with an epidermal inclusion cyst. This is a well-circumscribed mobile epidermal cyst occurring on the head, neck and trunk formed by keratinizing squamous epithelium with a granular layer. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 417 (28th ed. 1994).

depressive disorder, not otherwise specified. (R. At 132.) Dr. Amador assessed Bentley's Global Assessment of Functioning, ("GAF"), score at 40 to 45.[5] (R. at 132.)

On December 5, 2002, Dr. Amador completed a mental assessment indicating that Bentley had a limited, but satisfactory, ability to maintain personal appearance and a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to relate predictably in social situations, to behave in an emotionally stable manner, to demonstrate reliability and to understand, remember and carry out simple, detailed and complex job instructions. (R. at 133-34.) In all other areas of functioning, Dr. Amador concluded that Bentley had a poor or no ability. (R. at 133.) Dr. Amador concluded that Bentley was capable to manage benefits in her own best interest. (R. at 135.)

### *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood...." DSM-IV at 32. A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2004). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2004).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 5, 2004, the ALJ denied Bentley's claim. (R. at 18-22.) The ALJ found that Bentley met the disability insured status requirements of the Act through September 30, 1998. (R. at 22.) The ALJ found that Bentley had not engaged in substantial gainful activity since January 1, 1997. (R. at 22.) The ALJ also found that the medical evidence established that Bentley did not suffer from any severe impairment. (R. at 22.) Thus, the ALJ found that Bentley was not disabled under the Act and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(c) (2004).

As stated above, the court's function in the case is limited to determining

whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bentley argues that the ALJ's decision is not based on substantial evidence. (Motion For Summary Judgment And Memorandum of Law On Behalf Of The Plaintiff, ("Plaintiff's Brief"), at 5.) In particular, Bentley argues that the ALJ erred in failing to find that she suffered from a severe impairment. (Plaintiff's Brief at 5-8, 11.) Bentley further argues that the ALJ erred in failing to give great weight to the opinions of her treating physician, Dr. Moore, and to her treating psychiatrist, Dr. Nelson. (Plaintiff's Brief at 8-11.)

Bentley argues that the ALJ erred by finding that she did not suffer from a severe physical or mental impairment. I disagree. The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2004). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work

-12-

situations and dealing with changes in a routine work setting.  *See* 20 C.F.R. § 404.1521(b) (2004).  The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

While the record reflects gaps in treatment of nine months and seven months, aside from one exacerbation, Bentley's anxiety and depression were controlled with medication. (R. at 51, 54, 57-58.)  "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).  While Dr. Nelson diagnosed major depression in March 1998, the ALJ found that his opinion was not supported by the record. (R. at 20.)  The ALJ found that Dr. Nelson's diagnosis and narrative was further invalidated by Bentley's MMPI performance and the fact that she failed to return for further psychological examination as requested. (R. at 20, 59.)  In September 1998, Dr. Cox reported that Bentley's capacity for understanding was intact and she was able to show sustained concentration. (R. at 62.)  She did not exhibit any sensory deficits, nor was there any motor function deficits. (R. at 63.)  In September 1998, the state agency psychologist found that Bentley was only slightly restricted in her activities of daily living and in maintaining social functioning. (R. at 73.)  He also found that Bentley seldom experienced deficiencies of concentration, persistence or pace and that she had experienced no episodes of decompensation. (R. at 73.)  In addition, the record does not demonstrate that Bentley's degenerative disc disease was a severe impairment.

In September 1998, Dr. Cox's examination was essentially unremarkable for any physical impairments. (R. at 62-64.) An x-ray of Bentley's lumbar spine revealed disc space narrowing, but no acute abnormality or disc herniation. (R. at 64.) Based on this, I find that substantial evidence exists in the record to support the ALJ's finding that Bentley did not suffer from a severe physical or mental impairment. I also find that the ALJ sufficiently weighed the medical evidence and that the opinions of the state agency psychologists support the ALJ's findings.

## *IV. Conclusion*

For the foregoing reasons, Bentley's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the Commissioner's decision to deny benefits will be affirmed.

An appropriate order will be entered.

DATED:   This 6th day of July, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE